**Earl C. LOCKHART, Appellant/Cross–Appellee,**

v.

**Duane DRAPER, Michael J. Draper, Denise Gauthier, and Diane Baker, Appellees/Cross–Appellants.**

Nos. S–12868, S–12838.

Supreme Court of Alaska.

June 26, 2009.

Andrew J. Fierro, Law Office of Andrew J. Fierro, Inc., Anchorage, for Appellant/Cross–Appellee.

Wayne G. Dawson, Coryell Dawson, LLC, Anchorage, Brad DeNoble, Law Office of Brad DeNoble, LLC, Eagle River, for Appellees/Cross–Appellants.

Before: Fabe, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

## OPINION

PER CURIAM.

Earl Lockhart ("Lockhart") appeals from a judgment of the superior court awarding punitive damages against him for his role as the recipient of a fraudulent conveyance. The judgment awarded Duane Draper, Michael Draper, Denise Gauthier, and Diane Baker (collectively "Draper") punitive damages of $24,000, prejudgment interest of $14,183.67, and attorney's fees of $4,320. Draper cross-appeals.

On May 15, 2007, the Honorable Gregory J. Motyka, superior court judge pro tem, entered a written order explaining the facts and procedural setting of the case and making findings of fact and conclusions of law. The order is appended. Except as noted, we affirm the judgment.

## APPEAL ISSUES

Lockhart presents four arguments on appeal. We set them out below and briefly respond to each.

**Argument A: "The Trial Court Erred in Finding Earl Lockhart Liable for Punitive Damages by Relying Solely on Unanswered Requests for Admissions Which the Court Deemed Admitted."**

**Response:**

Without passing on the question of whether a punitive damages award cannot ever be exclusively based on unanswered requests for admission, we observe that the award here does not fit this description. Here, though the court relied on the admissions to determine if punitive damages would be appropriate under AS 09.17.020(b),[1] the court also held a two-day hearing on punitive damages before awarding them. At the hearing, the court heard a significant amount of evidence, including Lockhart's own testimony, about the contents of the admissions, such as the inadequacy of the consideration for the fraudulent deed of trust and Lockhart and his brother Jimmie Lockhart's intent in executing it. The court also heard evidence on the issue of how reprehensible Lockhart's conduct was. Although the court's interlocutory ruling on liability for punitive damages was largely based on the unanswered requests, the court could have reversed itself upon hearing Lockhart's testimony at the trial if it had found his explanation credible. But, to the contrary, the court observed that Lockhart's explanation for his conduct "doesn't make sense" and in its formal conclusions of law noted that even without relying on the requests the conclusion was "inescapable" that Lockhart knew his brother "did not owe him the $150,000 ... yet went along with the deception." We therefore reject this argument.

**Argument B: "The Trial Court Erred in Finding That Draper Met His Burden of Proof to Warrant an Award of Punitive Damages."**

**Response:**

■ The court could reasonably conclude from Lockhart's testimony, as it did, that Lockhart acted in "total disregard" for Draper's rights by going "along with the deception" in accepting the deed of trust, and by maintaining title in Lockhart's name despite learning of Draper's award to "delay and frustrate" Draper's attempts to enforce that judgment and to protect Lockhart's financial interest in the duplex. The court's findings were thus not clearly erroneous, and the court did not err in concluding there was clear and convincing evidence to support awarding punitive damages.

---

1. AS 09.17.020(b) provides: "The fact finder may make an award of punitive damages only if the plaintiff proves by clear and convincing evidence that the defendant's conduct (1) was outrageous, including acts done with malice or bad motives; or (2) evidenced reckless indifference to the interest of another person."

Argument C: "The Trial Court Erred in Awarding Punitive Damages in a Fraudulent Conveyance Action in the Absence of Proof of Actual Harm or Loss or That Voiding the Conveyance Was an Inadequate Remedy."

**Response:**

In *Haskins v. Shelden*,[2] we held that punitive damages may be available though actual damages are not an "essential element" of the cause of action if (1) the underlying cause of action states a claim for relief independent of the request for punitive damages, and (2) the plaintiff establishes that defendant's conduct rose to the requisite level of culpability and that plaintiff suffered "substantial damage," even if the amount of actual damages may be uncertain.[3]

■ The superior court concluded in its oral findings at the October 5, 2005 hearing that it could award punitive damages "in a case where something substitutes for the compensatory damages, i.e., the wrongful conveyance which is righted." Given the principles announced in *Haskins*, the court did not err in finding that punitive damages could be awarded if an equitable remedy intended to make the plaintiff whole had been awarded and if the requirements of AS 09.17.020(b) are met. Here, Draper's original complaint sought specific relief independent of his punitive damages claim: voiding the conveyance. As with the replevin claim in *Haskins*, actual damages are not an essential element of a fraudulent conveyance ac-

tion.[4] The record contains substantial evidence supporting the court's finding that Lockhart and Jimmie Lockhart's actions were sufficiently culpable to permit punitive damages[5] and caused Draper substantial damage he could not collect his judgment against Jimmie Lockhart for several years and has incurred significant legal fees. Thus, we conclude the superior court did not err in awarding punitive damages absent a compensatory damages award.

Argument D: "The Trial Court Abused Its Discretion in Failing To Permit Earl Lockhart To Withdraw the Unanswered Requests for Admission."

**Response:**

Because Lockhart never filed a motion to withdraw the admissions, this contention has no merit.

## PREJUDGMENT INTEREST

Although none of Lockhart's points on appeal has merit, we note one point of plain error prejudicial to Lockhart. The court awarded prejudgment interest on the punitive damages award. Our case law is clear that this is impermissible.[6]

■ In *Hutka v. Sisters of Providence in Washington* we vacated an award of prejudgment interest on a liquidated damages award though the party had waived the argument by failing to properly raise it below because the award constituted an impermissible dual

2.  558 P.2d 487 (Alaska 1976).

3.  *Id.* at 492–93 (quoting McCormick, Damages § 83 (West 1953)) (explaining that plaintiff must show "the existence of malice in the wrongdoer's actions"); *cf. Barber v. Nat'l Bank of Alaska*, 815 P.2d 857, 864 & n. 16 (Alaska 1991) (holding punitive damages may be awarded in nominal damages cases and citing *Haskins*).

4.  *See Gabaig v. Gabaig*, 717 P.2d 835, 839 n. 6 (Alaska 1986) (listing typical badges of fraud); *Haskins*, 558 P.2d at 492–93.

5.  The conduct for which punitive damages were awarded in this action relates to Lockhart's acceptance of the conveyance knowing that he was participating in a scheme to deprive Draper of his rights and to Lockhart's subsequent machinations in furtherance of that purpose. This con-

duct was tortious regardless of the nature of Draper's underlying claim against Jimmie Lockhart. Nonetheless, the underlying action was a tort claim for fraudulent misrepresentation and fraud. Thus, this case does not fall within the dictum in *Summers v. Hagen*, 852 P.2d 1165 (Alaska 1993), that "[b]ecause the underlying debt sounds in contract, not tort, exemplary damages [in a fraudulent conveyance action] ... are not authorized." *Id.* at 1170. Our conclusion concerning the tortious nature of Lockhart's conduct and its independence from the underlying claim nonetheless calls into question the continuing validity of the *Summers* dictum.

6.  *Bobich v. Stewart*, 843 P.2d 1232, 1236 (Alaska 1992) (citing *Andersen v. Edwards*, 625 P.2d 282, 289 (Alaska 1981); *Andersen*, 625 P.2d at 289 ("Punitive damages are not compensation for actual physical harm, and prejudgment interest is generally not awarded on punitive damages.")).

recovery and thus, plain error.[7] Because prejudgment interest likewise may not be awarded on punitive damages, the court's award constituted plain error.[8] We thus vacate the award of prejudgment interest against Lockhart in the amount of $14,183.67.[9]

## CROSS–APPEAL ISSUES

Draper presents six arguments on cross-appeal. We set them out below and briefly respond to each.

**Argument 1: "The Superior Court Erred By Precluding Evidence Concerning Lockhart's Property Acquisitions."**

**Response:**

■ The court did not abuse its discretion in refusing to admit the evidence in question. The events occurred four years after the fraudulent conveyance and thus would have had little, if any, probative value as to Lockhart's earlier fraudulent conduct and intent.

**Argument 2: "The Superior Court Erred By Not Requiring Lockhart To Produce The Requested Financial Records."**

**Response:**

■ Contrary to Draper's assertions, the court, acting as fact finder, may but is not required to consider the defendant's wealth in determining the amount of punitive damages to award.[10] And the record shows that Lockhart produced over one thousand pages of documents relating to the duplex, his real estate trust, his refinance documents, his indemnity agreement with his title company, and his tax returns from 2001 to 2004. The

record also contains listings and value assessments of Lockhart's California properties, as well as of the duplex. To the extent the court found that Lockhart had complied with the production order, the court's finding was not clearly erroneous and the court did not abuse its discretion in declining to order additional production.

**Argument 3: "The Superior Court Erred By Failing To Consider The Economic Benefit Lockhart Received From Equity In The Duplex."**

**Response:**

Contrary to Draper's assertion, the court made findings on this issue, though it ultimately concluded that (1) it was "not convinced by [Draper's] argument that [Lockhart] benefited in some way from the inclusion of Jimmie Lockhart's equity in the duplex in his California real estate portfolio," and (2) the value of the duplex was "largely irrelevant" to the punitive damages calculation because even if no fraudulent conveyance had occurred, Draper could not have recovered more than $12,000 from Jimmie Lockhart, the amount of his compensatory damages award.

**Argument 4: "The Superior Court Erred In The Amount Of Its Award Of Punitive Damages."**

**Response:**

■ Here, the court applied each of the AS 09.17.020(c) factors to its findings of fact and considered Lockhart's net worth. It found that at the time Lockhart and his brother Jimmie Lockhart executed the 2001 deed of trust for inadequate consideration, it

---

**7.** 102 P.3d 947, 960 (Alaska 2004).

**8.** *Cf. Hutka,* 102 P.3d at 960; *Bobich,* 843 P.2d at 1236.

**9.** In *Great Western Savings Bank v. George W. Easley Co.,* 778 P.2d 569 (Alaska 1989), we concluded an error "not raised in the trial court and ... not raised on appeal" was "thus not grounds for reversing the judgment." *Id.* at 579. But that statement does not apply to cases of plain error. *See Cragle v. Gray,* 206 P.3d 446, 450 (Alaska 2009) ("We generally decline to review issues not raised in the superior court except to the extent there may be plain error." (citing *Miller v. Sears,* 636 P.2d 1183, 1189 (Alaska 1981))).

**10.** *See* AS 09.17.020(c) (permitting but not requiring the fact finder to consider factors relevant to the defendant's financial condition and motives); AS 09.17.020(e) (permitting but not requiring courts to order financial documents be produced); *Pluid v. B.K.,* 948 P.2d 981, 986 (Alaska 1997) ("While the wealth of the defendant is a relevant inquiry on the issue of punitive damages, it is not a necessary element."); *Clary Ins. Agency v. Doyle,* 620 P.2d 194, 205 (Alaska 1980) (affirming a punitive damages award though "there [was] an absence of evidence relating to the wealth of the defendants" because "the conduct was outrageous").

was likely that serious harm to Draper would arise and that Lockhart and his brother were aware of this likelihood.[11] The court also found that Lockhart's net worth of around $20 million supported a higher amount of punitive damages. But the court also properly considered factors supporting a lower amount, including the amount of compensatory damages Draper was awarded against Jimmie Lockhart in the lawsuit precipitating the fraudulent conveyance action ($12,000)[12] and the fact this case did not involve physical or widespread environmental harm.[13]

The record supports the court's conclusion based on these findings. Its award of twice the amount of compensatory damages, or $24,000, was not "manifestly unreasonable."[14] A two-to-one ratio is well within the ratios considered permissible under Alaska law.[15] Though the record supports the court's finding that Lockhart participated in the fraudulent conveyance and deliberately failed to correct it for several years to protect Jimmie Lockhart and his own financial interest in the duplex, that conduct does not rise to the level of reprehensibility required to support a significantly higher ratio.[16] The

court's considered approach demonstrates it did not reach this amount out of "passion" or "prejudice."[17] Its deliberate application of the AS 09.17.020(c) factors and its decision to award an amount well within AS 09.17.020(f)'s boundaries and within our permitted range of ratios show the court did not act "in disregard of rules of law" in awarding $24,000 in punitive damages against Lockhart.[18]

## Argument 5: "The Superior Court Erred By Failing To Award Draper Enhanced Attorney Fees."

**Response:**

■■ Some of the court's conclusions under AS 09.17.020(c) could support enhanced fees under Alaska Civil Rule 82(b)(3). For instance, the court's findings that Lockhart and his brother "engaged in a several year long shell game designed to thwart the lawful judgment [Draper] obtained against [Jimmie Lockhart]," "engaged in a continuous game of disinformation and concealment," and acted in "deliberate, wanton and flagrant ... violation of [Draper's] rights" could support

11. *See* AS 09.17.020(c)(1) & (2).

12. *See* AS 09.17.020(c)(7) & (f).

13. *See Casciola v. F.S. Air Serv., Inc.,* 120 P.3d 1059, 1069 n. 40 (Alaska 2005) (discussing cases in which double-digit ratio awards were justified because of highly reprehensible conduct, including *Leatherman Tool Group, Inc. v. Cooper Industries, Inc.,* 285 F.3d 1146, 1151–52 (9th Cir.2002) (ten-to-one ratio in stolen trade secrets case); *Johansen v. Combustion Engineering, Inc.,* 170 F.3d 1320, 1336–39 (11th Cir.1999) (ninety-three-to-one ratio in water pollution case); *Kimzey v. Wal–Mart Stores, Inc.,* 107 F.3d 568, 577–78 (8th Cir.1997) (ten-to-one ratio in egregious sexual harassment case)).

14. *See Pluid,* 948 P.2d at 983 ("We will overturn an award of punitive damages entered by a court sitting as the trier of fact only if it is manifestly unreasonable." (citing *Alaska Statebank v. Fairco,* 674 P.2d 288, 296 (Alaska 1983))).

15. AS 09.17.020(f) (capping punitive damages at three times compensatory damages or $500,000, whichever is greater); *see Ace v. Aetna Life Ins. Co.,* 40 F.Supp.2d 1125, 1128 (D.Alaska 1999) (stating "damage ratios in reported Alaska decisions have been in the range of 5:1 or less, with higher ratios in rare cases," and citing *Pluid,* 948 P.2d at 983 (five-to-one in child sexual assault case); *Cummings v. Sea Lion Corp.,* 924 P.2d

1011, 1016 (Alaska 1996) (significantly less than one-to-one in fiduciary fraud case); *Great W. Sav. Bank v. George W. Easley, Co.,* 778 P.2d 569, 574–75 (Alaska 1989) (significantly less than one-to-one ratio in negligence and breach of contract case); *Teamsters Local 959 v. Wells,* 749 P.2d 349, 361 n. 26 (Alaska 1988) (ratio of less than three-to-one in case dealing with death threats and violence against union member by union); *Alaskan Village v. Smalley,* 720 P.2d 945, 949 (Alaska 1986) (two-to-one in dog mauling child case)); *see also State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (stating "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process").

16. *Cf. Casciola,* 120 P.3d at 1061, 1067–68 (upholding a ten-to-one ratio award because undisputed evidence showed the defendant had intentionally deceived the plaintiff into believing it had the authority to sell jet engines for financial profit, deceiving the plaintiff out of $25,000, had engaged in an ongoing pattern of fraud, deceit, and misrepresentation, and had committed near-criminal acts).

17. *See Pluid,* 948 P.2d at 983.

18. *See id.*

enhancing fees to the extent the findings show "vexatious or bad faith conduct" or conduct affecting the "length of trial." [19] But the fact that these findings could support a variation does not mean the court abused its discretion in denying enhanced fees.[20]

Furthermore, the record contains facts supporting the court's denial of enhanced fees. With regard to length of trial, Draper also caused delays, waiting two years to serve Lockhart with discovery requests and four months from the date of the discovery requests to move for summary judgment on liability. Further, the fact that Draper established liability for fraudulent conveyance on summary judgment and based on requests deemed admitted suggests the litigation was not so complex as to warrant enhanced fees.[21] Additionally, the court's finding that Jimmie Lockhart "peppered the court and opposing counsel with numerous unintelligible pleadings apparently aimed at further obstructing the truth and the final determination of the issue raised" would not support an enhanced fee award against Lockhart because the

court did not make a similar finding regarding him.[22]

Given all of these factors, we conclude the superior court did not clearly abuse its discretion in refusing to apply the Rule 82(b)(3) factors to vary the fee award.

### Argument 6: "The Superior Court Erred By Failing To Award Costs To Draper."

**Response:**

██ Draper timely moved for claimed costs of $944.72 on May 29, 2007, the last day permissible under Civil Rule 79(b).[23] But he failed to include an itemized and verified cost bill showing the dates costs were incurred by May 29, providing only a list of "[a]llowable [c]osts."[24] He submitted an itemized list of charges for attorney's fees on June 19, 2007, but again that list failed to include an itemized and verified cost bill showing dates for when costs were incurred. Because Draper neither filed an itemized and verified cost bill showing dates for when costs were incurred within the ten days required by Rule 79(b) nor moved for leave to file the itemized and verified cost bill late,[25] he waived his right to

19. Alaska R. Civ. P. 82(b)(3)(B) & (G); *see also Crittell v. Bingo,* 83 P.3d 532, 537 (Alaska 2004) (upholding enhanced fees that the superior court had awarded for vexatious and bad faith conduct based on the fraudulent nature of the underlying claims and the "fraudulent manner" in which they were prosecuted, and explaining "our case law establishes that an award of enhanced fees under Rule 82 may be based on vexatious and bad faith litigation 'both as to the filing of the case and the prosecution of it'" (quoting *Garrison v. Dixon,* 19 P.3d 1229, 1234 (Alaska 2001))).

20. *See Rhodes v. Erion,* 189 P.3d 1051, 1055 (Alaska 2008) ("Application of Rule 82(b)(3) factors is discretionary, not mandatory."). Draper also argues Lockhart's net worth of around $20 million means an enhanced award would not be "so onerous to the non-prevailing party that it would deter similarly situated litigants from the voluntary use of the courts." *See* Alaska R. Civ. P. 82(b)(3)(I) (including that factor as a consideration in awarding fees). He argues that in fact, the fee award is "so small in comparison to Lockhart's net worth that it will not deter Lockhart or other judgment debtors." But the purpose of attorney's fee awards is not punishment or deterrence; those are the goals of punitive damages, and Draper was already awarded punitive damages. *See Cooper v. Carlson,* 511 P.2d 1305, 1310–11 (Alaska 1973) (explaining courts may not use fee requests "as a vehicle for accomplishing any purpose other than providing compensation where it is justified" (citing and

quoting *Preferred Gen. Agency of Alaska, Inc. v. Raffetto,* 391 P.2d 951, 954 (Alaska 1964))).

21. *See* Alaska R. Civ. P. 82(b)(3)(A).

22. *See cf. Reid v. Williams,* 964 P.2d 453, 461–62 (Alaska 1998) (concluding superior court did not abuse its discretion in denying enhanced fees on the basis of alleged "vexatious or bad faith conduct" and reasoning the "superior court was in the best position to determine whether a party's behavior was excessively litigious or in bad faith").

23. The date of distribution of the court's final judgment was May 16, 2007. Accounting for weekends and holidays, the ten-day deadline imposed by Rule 79(b) fell on May 29.

24. *See* Alaska R. Civ. P. 79(b) ("To recover costs, the prevailing party must file and serve an itemized and verified cost bill, showing the date costs were incurred, within 10 days after the date shown in the clerk's certificate of distribution on the judgment.").

25. *See Worland v. Worland,* 193 P.3d 735, 742 (Alaska 2008) (explaining in the context of a Rule 82 motion that when a party fails to file a motion within the time period proscribed by a rule, the party should be required to file a motion for extension demonstrating "excusable neglect or

recover costs and the court did not err by not awarding him costs.[26]

For the above reasons, we AFFIRM the judgment of the superior court except with respect to prejudgment interest. The award of prejudgment interest against Lockhart is VACATED. Since the award of attorney's fees granted Draper was based in part on the prejudgment interest award, the court is authorized to adjust the fee award.

## APPENDIX

### IN THE [SUPERIOR] COURT FOR THE STATE OF ALASKA

### THIRD JUDICIAL DISTRICT AT ANCHORAGE.

DUANE DRAPER, MICHAEL J. DRAPER, DENISE GAUTHIER, and DIANE BAKER,

    Plaintiff(s),

vs.

JIMMIE DREW LOCKHART, JR., and EARL C. LOCKHART,

    Defendant(s).

Case No. 3AN–01–5541CI

### *ORDER*

This matter having come before this court, sitting as a Superior Court Judge Pro-tem, for the final proceeding pursuant to AS 09.17.020(c) to determine the amount of punitive damages to be awarded against Defendants Earl Lockhart and Jimmie Drew Lockhart Jr. was heard on October 4 and 27, 2006. Based upon the testimony, admissions, pleadings, and documented evidence submitted to the court and considering the arguments of counsel, the court makes the following findings of fact and conclusions of law.

### *Findings of Fact*

1. At some time in the mid–1990's, Plaintiffs' father died after being involved in a divorce proceeding. When his children, the above captioned Plaintiffs, went through his personal affects, they discovered that their father had contacted Jimmie Drew Lockhart Jr. for legal services aimed at possibly setting aside the unfavorable property settlement that had resulted from their father's divorce.

2. On November 7, 1997, Plaintiffs entered into a written contract with Jimmie Drew Lockhart, Jr. to represent them on behalf of their deceased father in a lawsuit against the State of Alaska and other entities. As part of that contract, Plaintiffs agreed and did pay the sum of fifteen thousand dollars to Jimmie Drew Lockhart Jr. as a retainer.

3. Plaintiffs subsequently discovered that Jimmie Drew Lockhart Jr. was not an attorney as he had led them to believe and when he refused to return the retainer money, Plaintiffs brought suit against him, Independent Legal Consultant Services, and James S. Bounds in case number 3AN–99–11150CI.

4. On January 10, 2001, the Honorable Peter Ashman, District Court Judge, granted Plaintiffs' Summary Judgment as to liability in that case.

5. Judge Ashman also ordered that a hearing be held to review Plaintiffs' evidence on the amount of compensatory damages and ordered Plaintiffs to provide additional briefing on the authority to award punitive damages. If appropriate, Plaintiffs would be entertained at the hearing addressing compensatory damages set for February 5, 2001.

6. At the time Judge Ashman issued his January 10, 2001 decision, Defendant Jimmie Drew Lockhart Jr.'s main asset was a duplex, which he owned on Randolph Street in Anchorage, Alaska (hereinafter "duplex"). The legal description is known as:

> Block 8 Lot 10 Green Acres Subdivision, according to the official plat thereof, filed under plat P–153, in the Anchorage Re-

---

other good cause for failing to act in a timely manner" in filing the motion).

    Rule 79(b) permits courts to allow additional time, but Draper failed to file a motion requesting such additional time.

**26.** *See* Alaska R. Civ. P. 79(b).

cording District, Third Judicial District, State of Alaska

7. Jimmie Drew Lockhart Jr., has a brother named Earl C. Lockhart who resides in California. The testimony and exhibits submitted to the court lead to the conclusion that Earl Lockhart is in a substantially better financial situation than his brother Jimmie Drew Lockhart Jr., and that from time to time, Earl gives money to his brother to pay for real estate tax obligations on the duplex.

8. The February 5, 2001 hearing scheduled by Judge Ashman in case number 3AN–99–11150CI was continued by Judge Ashman until February 21, 2001.

9. On or about February 15, 2001, Defendant Jimmie Drew Lockhart Jr. conveyed to his brother Earl Lockhart, via a $150,000.00 deed of trust, all the equity in the duplex which was greater than the homestead exemption established in AS 09.38.010.

10. Although the $150,000.00 deed of trust purported to secure the payment of a promissory note dated February 14, 2001, payable to order, no such promissory note ever existed.

11. Furthermore, there was no adequate compensation paid for the $150,000.00 deed of trust by Earl Lockhart. Both Defendants subsequently admitted that no adequate compensation was paid for the deed of trust and Earl Lockhart further testified that not only did he not give his brother, Jimmie Drew Lockhart Jr. $150,000.00, but he would not loan him that amount either.

12. On February 21, 2001, Judge Ashman awarded compensatory damages in case 3AN–99–11150CI against the Defendants including Jimmie Drew Lockhart Jr., and further ruled that punitive damages were appropriate. It was at this same hearing that the court and the Plaintiffs first learned that Jimmie Drew Lockhart Jr. had transferred the duplex to his brother Earl Lockhart.

13. After learning about the transfer, Plaintiffs subsequently filed the instant fraudulent conveyance action against Jimmie Drew Lockhart Jr. and Earl Lockhart on March 8, 2001.

14. On April 14, 2001, Plaintiffs effectively served Earl Lockhart in this case.

15. Earl Lockhart testified that after reading the summons and complaint, he mailed the $150,000.00 deed of trust back to Alaska and was upset for being brought into the action.

16. The court concludes that Earl Lockhart is a sophisticated owner of multiple pieces of real estate in California and was well represented by legal counsel in California during all times relevant.

17. The court finds it highly probative that Earl Lockhart did not take any steps to re-convey, warranty deed, or [quit] claim deed any interest he had in the $150,000.00 deed of trust back to his brother, Jimmie Drew Lockhart Jr. Both before and after this time frame, Earl Lockhart had used warranty deeds to re-convey interests in the same piece of property to his brother, Jimmie Drew Lockhart Jr. The court concludes that Earl Lockhart would have understood that simply mailing the deed of trust back to Alaska and claiming to be "upset" would do nothing to remove the encumbrance on the duplex, thereby effectively blocking Plaintiffs' collection efforts. Earl Lockhart has amassed a real estate portfolio in excess of $20,000,000.00 by buying both commercial and residential income properties. The court concludes he was well represented by legal counsel versed in the art of real estate law.

18. On or about October 20, 2001, the court stayed case number 3AN–99–11150CI, as Plaintiffs pursued the instant case.

19. On January 23, 2003, Earl Lockhart finally executed a full re-conveyance of the duplex to his brother Jimmie Drew Lockhart Jr. but the full re-conveyance was not recorded until February 25, 2003.

20. Meanwhile, on January 27, 2003, Defendant Jimmie Drew Lockhart Jr. once again transferred the duplex *back* to his brother Earl C. Lockhart via a legal device referred to as the Lockhart Real Estate Trust (dated April 16, 2002). *This* warranty deed was recorded January 27, 2003, almost a full month *before* the January 23, 2003 full

re-conveyance by Earl Lockhart to Jimmie Drew Lockhart Jr. was recorded.

21. The court finds that the Lockhart Real Estate Trust dated April 16, 2002, is a revocable real estate trust controlled by the Defendant Earl Lockhart and his wife, Velma Lockhart. The testimony leads the court to believe that Earl Lockhart could have [quit] claimed the duplex out of the trust at any time, but chose not to do so.

22. The court concludes from the testimony and the evidence that Earl Lockhart kept control of the equity in the duplex for one or both of the following reasons. First, Earl Lockhart had an interest in protecting his brother, who was not as well off financially as he was. He had done so in the past, and it is more likely than not that he acted to Plaintiffs' [detriment] so as to protect Jimmie Drew Lockhart Jr.'s financial interest in the duplex. Secondly, Earl Lockhart more likely than not acted for his own financial self interest because he had made various tax payments over the years to keep the duplex in his brother's possession. Indeed, Earl Lockhart testified that the reason he did not transfer the duplex back to Jimmie Drew Lockhart Jr. after being served with the summons and complaint was that it was "not to his benefit."

23. On May 14, 2003, the court, upon motion by counsel for Defendant, and written stipulation by the client, ordered that Ralph Ertz be allowed to withdraw as counsel for Earl Lockhart.

24. On June 9, 2003, Plaintiffs served Earl Lockhart at his home address with discovery requests, which he subsequently ignored. As a result, critical requests for admissions were deemed admitted by the court.

25. On June 9, 2003, Plaintiffs also served Jimmie Drew Lockhart Jr. with discovery requests. Likewise, Jimmie Drew Lockhart Jr. failed to respond, and those requests for admissions were subsequently deemed admitted.

26. On October 21, 2003, Plaintiffs filed their Motion for Partial Summary Judgment. On March 25, 2004, the court granted the Motion for Partial Summary Judgment and set aside the conveyance of the duplex from Jimmie Drew Lockhart Jr. to Earl Lockhart. The court specifically found at that time that Defendant Jimmie Drew Lockhart Jr. and his brother Earl C. Lockhart engaged in a fraudulent conveyance of the duplex owned by Jimmie Drew Lockhart Jr. The court found that the conveyance was made knowingly by the Defendants and with deliberate intention to hinder, delay, or defraud Plaintiffs of all damages, suits, debts, demands, and/or efforts to collect on any judgments related to case number 3AN–99–11150CI.

27. Following the March 25, 2004 order, Earl Lockhart took no action to transfer the duplex out of the Lockhart Real Estate Trust.

28. On June 10, 2004, Plaintiffs filed their Motion for Punitive Damages, Attorneys fees, and Costs. Earl Lockhart did not respond to this motion.

29. On October 28, 2004, the court entered judgment and final order for punitive damages and attorney's fees. Earl Lockhart took no action until Plaintiffs began seeking to enforce their judgment against Earl Lockhart's assets in California.

30. On February 7, 2005, the Superior Court for the State of California, Central District, entered a sister-State judgment in favor of Plaintiffs against Earl Lockhart in the sum of $116,156.16 plus interest thereon at the rate of 5% per annum. After being duly served with the notice of entry of judgment, the sister-State judgment became final against Earl Lockhart on or about March 9, 2005, and Plaintiffs recorded an abstract of that judgment in California at the Los Angeles County recorder's office on May 31, 2005.

31. On or about June 17, 2005, Defendant Earl Lockhart filed a Motion to Set Aside Judgment and Final Order for Punitive Damages and Attorneys fees in the instant action.

32. On July 22, 2005, this court granted Earl Lockhart's Motion to Set Aside Judgment and Final Order for Punitive Damages and Attorneys fees. However, on September 2, 2005, the court granted in part and denied in part Plaintiff's Motion for Reconsideration.

33. On October 5, 2005, this court held that Plaintiffs had established by clear and

convincing evidence that Earl Lockhart's conduct was sufficiently outrageous and evidenced a reckless indifference to the interests of another to meet Plaintiffs' burden under AS 09.17.020(b)(1)(2). The court further ordered Earl Lockhart to produce financial records so as to enable the court to consider the proper amount of punitive damages. At best, Earl Lockhart's compliance with that order was marginal.

### Conclusions of Law

Once the court concludes from the facts that Plaintiff has proven by clear and convincing evidence Defendants' conduct was 1) outrageous, including acts done with malice or bad motives or 2) evidenced reckless indifference to the interest of another person, the court in a separate proceeding is directed by AS 09.17.020(c) to determine the amount of punitive damages to be awarded. The fact finder may consider the following:

1) **The likelihood at the time of the conduct that serious harm would arise from the Defendants' conduct.**

The original fraudulent conveyance of the duplex occurred shortly after summary judgment was entered by Judge Peter Ashman against Jimmie Drew Lockhart Jr. Jimmie Drew Lockhart Jr.'s motive was clear. Knowing that the one piece of property that he owned in his name would soon to be subject to a judicial lien and subsequent foreclosure, he took steps to protect his financial interest at the expense of the Plaintiffs. Jimmie Drew Lockhart Jr. created the paperwork that purported to secure a $150,000.00 promissory note that was entirely fictitious.

Earl Lockhart went along with the deception. Earl Lockhart knew that Jimmie Drew Lockhart Jr. did not owe him the $150,000.00 represented by the deed of trust yet went along with the deception. The court finds this conclusion inescapable even without relying upon the request for admissions deemed admitted. Earl Lockhart, either out of misguided brotherly concern, personal financial interest, or both, engaged in a several year long shell game designed to thwart the lawful judgment Plaintiffs obtained against Jimmie Drew Lockhart Jr. for compensatory damages.

2) **The degree of the Defendants' awareness of the likelihood that serious harm would arise from his conduct.**

Clearly, Jimmie Drew Lockhart Jr. was aware of Judge Ashman's granting of the Motion for Summary Judgment and his impending liability likely to result from the Final Judgment. The fraudulent conveyance to Earl Lockhart was designed to frustrate collection of a legitimate judgment. Earl Lockhart, knowing that he had not given his brother consideration for the purported deed of trust, went along with his brother's actions. Then Earl Lockhart subsequently used his considerable resources to delay and frustrate Plaintiffs' recovery of the monies awarded by Judge Ashman. During the course of several years, the testimony establishes a course of conduct by Earl Lockhart consistent with a total disregard of Plaintiffs' legal rights against Jimmie Drew Lockhart Jr.

3) **The amount of financial gain that Defendant gained or expected to gain as a result of the Defendants' conduct.**

As a result of the fraudulent transfer, Defendant Jimmie Drew Lockhart Jr. was able to protect a portion of the equity in the duplex from execution by Plaintiffs. It also allowed Jimmie Drew Lockhart Jr. to keep living in one side of the duplex and controlling any rents that he would have received from the other unit of the duplex. Defendant Earl Lockhart, by assisting in the fraudulent conveyance through the years, was able to protect whatever financial interest he had in the duplex by providing monies for real estate taxes, etc.[1]

1. However, this court is not convinced by Plaintiffs' argument that Earl Lockhart benefited in some way from the inclusion of Jimmie Lockhart's equity in the duplex in his California real estate portfolio.

**4) The duration of the conduct and any intentional concealment of the conduct.**

It has been over six years since Defendant Jimmie Drew Lockhart Jr. conveyed to his brother Earl Lockhart via a $150,000.00 deed of trust, all of the equity in the duplex in question. Although both Defendants knew that there was no underlying debt to support the fictitious $150,000.00 deed of trust, the Defendants nonetheless engaged in a continuous game of disinformation and concealment.

**5) The attitude and conduct of the Defendants' upon discovery of the conduct.**

When it became obvious that Plaintiffs had become aware of the shell game, Defendants took further deliberate actions to frustrate Plaintiffs' rightful attempts to execute on the property. Jimmie Drew Lockhart Jr. peppered the court and opposing counsel with numerous unintelligible pleadings apparently aimed at further obstructing the truth and the final determination of the issue raised by the litigation.

**6) The financial condition of the Defendants.**

There is little evidence in the record concerning the financial condition of Jimmie Drew Lockhart Jr. From statements made by Earl Lockhart, it seems probable that the only real asset owned by Jimmie Drew Lockhart Jr. is the duplex in question. On the other hand, Earl Lockhart is much wealthier and, while not in the company of the "super rich," his probable net worth is in the range of $20,000,000.00.

**7) The total deterrents of other damages and punishment imposed on the Defendants as a result of the conduct including compensatory and punitive damage awards to persons similarly situated to the Plaintiffs and the severity of the criminal penalties to which the Defendants have been or may be subjected.**

As a practical matter, there are no criminal penalties to which either Defendant will probably be subjected to. Defendant Jimmie Drew Lockhart Jr. had a $14,000.00 judgment entered against him by Judge Ashman for his misrepresentation to Plaintiffs. Earl Lockhart has been found by this court to have been a participant in a fraudulent conveyance under AS 34.40.010. Absent an award of punitive damages, the only deterrent Defendants would face for such similar bad acts would be the resulting attorney's fees incurred.[2]

### The availability of punitive damages in a wrongful conveyance case.

Defendant Earl Lockhart argues that since there were no compensatory damages awarded against him in this fraudulent conveyance action, punitive damages are unavailable. The issue of whether punitive damages are appropriate in a fraudulent conveyance action has not been addressed by the Alaska Supreme Court. However, other courts have reached different decisions on that question.

In *Blakeslee v. Rabinor*,[3] the plaintiff Blakeslee discovered that the owners of several adjoining properties were using her sewer pipes to discharge waste into the city sewer system which damaged and flooded her property. Plaintiff brought an action against Three Twenty-nine Holding Corp., and while the Motion for Summary Judgment was pending, the corporation transferred title to another corporation, the partners of which who were the defendants in *Blakeslee*. Because these two corporations had interlocking [principals] at the time of the transfer, because the conveyance was made without fair consideration, and because Three Twenty-nine Holding Corp. was the defendant in the action for money damages at the time of the conveyance, plaintiff was able to establish a *prima facie* case for fraudulent conveyance. While the court acknowledged that punitive damages could be awarded in a case of fraudulent conveyance if the defendant's conduct was gross and wanton and involved high moral culpability, the court

---

**2.** *See Golconda Screw, Inc. v. West Bottoms, Ltd.,* 20 Kan.App.2d 1002, 894 P.2d 260, 266 (1995); *see also Blakeslee v. Rabinor,* 182 A.D.2d 390, 582 N.Y.S.2d 132 (1992).

**3.** 182 A.D.2d 390, 582 N.Y.S.2d 132 (1992).

determined that such a burden had not been met in this case.[4]

In Kansas, the courts have held that punitive damages are available in fraudulent conveyance actions and that an award of actual damages is not required before punitive damages can be awarded. In *Golconda Screw, Inc. v. West Bottoms, Ltd.*,[5] a judgment creditor brought an action against a corporate judgment debtor and its sole shareholders seeking to have the debtor's transfer of a warehouse to another corporate entity be found to be a fraudulent conveyance. The judgment creditor asked the court to disregard the corporate form and impose liability on shareholders individually. In holding that punitive damages could be awarded, the court noted that in order to recover such damages, a party must prove the opposing party acted with willful or wanton conduct, fraud, or malice. Specifically, the court held that "[s]uch damages may be awarded when appropriate to punish the willful transfer of a judgment debtor's only asset to avoid execution and to deter others from doing so."[6]

Other jurisdictions have also held that punitive damages may be awarded in fraudulent conveyance actions.[7] However, other jurisdictions have reached the opposite result.[8]

This court concludes that punitive damages are appropriate of a fraudulent conveyance. As the court stated in *Locafrance v. Interstate Distribution Services, Inc.*:[9]

> Considering the facts in this case, punitive damages are appropriate to deter the delinquent judgment debtor from attempting to avoid paying the judgments. Setting aside the conveyance and the other remedies set forth in R.C. 1336.10 and 1336.11 would not be a sufficient deterrent to discourage appellants and other debtors from

making fraudulent conveyances to avoid creditors. Without punitive damages as a deterrent, the purpose of the Fraudulent Conveyance Act would be severely weakened.[10]

In the instant case, it is clear that both Defendants were inclined to do whatever it took to safeguard Jimmie Drew Lockhart Jr.'s duplex from execution. They engaged in a course of conduct which was designed to frustrate Plaintiffs' attempts to satisfy what would ultimately be a legitimate judgment. Defendants' actions resulted in a horrific expenditure of attorney's fees by Plaintiffs to reverse the fraudulent conveyance. This court concludes that Defendants' deliberate, wanton and flagrant actions in violation of Plaintiffs' rights warrant the imposition of punitive damages.

### Calculating the amount of punitive damages

Plaintiffs allege that they have incurred over seventy thousand dollars in fees and costs in prosecuting this action as well as 3AN–99–11150CI. They allege that the value of the duplex was in excess of $200,000.00, and that the proper measure of punitive damages is five times the value of the duplex. In all, Plaintiffs are seeking an award of $1,187,000.00 against Defendant Earl Lockhart, (presumably because of his net worth), and the sum of $100,000.00 against Defendant Jimmie Drew Lockhart Jr.

The court concludes that Plaintiffs' rationale in arriving at these figures is flawed. While these two cases[11] contain an impressive combined seven volumes, it is easy to forget that this all started with a relatively minor compensatory damage award against Jimmie Drew Lockhart Jr. of $12,000.00 by Judge Ashman on February 21, 2001. The value of the equity in the duplex is largely

---

4. *Id.* at 133–34.

5. 20 Kan.App.2d 1002, 894 P.2d 260 (1995).

6. *Id.* at 266.

7. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Sorac, Inc.*, 1992 WL 182268 (D.D.C.); *see also Cavin v. Brown*, 246 Ga.App. 40, 538 S.E.2d 802 (2000).

8. *Nabours v. Longview Savings and Loan Ass'n*, 700 S.W.2d 901, 902 (Texas 1985); *see also Miller v. Kaiser*, 164 Colo. 206, 433 P.2d 772, 776–77 (1967).

9. 6 Ohio St.3d 198, 451 N.E.2d 1222 (1983).

10. *Id.* at 1226.

11. 3AN–99–11150CI & 3AN–01–05541CI.

irrelevant. Had the fraudulent conveyance not occurred, Plaintiffs would have only been able to execute upon it to the extent of their judgment of $12,000.00 plus costs.

Nor does the court necessarily agree that Plaintiffs' punitive damages award be somehow tied to the amount they expended in arriving at this point. Were the court to adopt this method, plaintiffs similarly situated would be encouraged to run-up their legal bills so as to bootstrap a large final award of punitive damages.

Instead, the court looks at the conduct of the parties and the amount of money Plaintiffs were reasonably precluded from obtaining as part of a rightful execution on the duplex. While the Defendants' conduct was certainly wanton, deliberate, and for their financial gain, it did not pollute Prince William Sound, injure infants, or place employees at risk of physical harm. This was a pure and simple wrongful act designed to work to the economic benefit of the Defendants. Although the court found this act wrong and therefore, actionable, it does not rise to the level of the worst examples of behavior which are punishable by multiple awards of what would be considered compensatory damages.[12] As stated above, the court concludes that Judge Ashman's compensatory damage award in 3AN–99–11150CI was $12,000.00. The court concludes that a similar award of $12,000.00 in punitive damages against Jimmie Drew Lockhart Jr. is appropriate. The court further concludes that a punitive damage award of $24,000.00 against Earl Lockhart is appropriate, given his role and financial net worth.

Counsel will provide a proposed judgment within 10 days.

DATED at Anchorage, Alaska this 15th day of May, 2007.

/s/ Gregory Motyka
[Superior Court Judge Pro Tem]

---

12. *See Casciola v. F.S. Air Service, Inc.*, 120 P.3d 1059, 1067 (Alaska 2005) (hinting that double, triple, or quadruple punitive damage awards may be close to the "constitutional line" in the absence of reprehensible misconduct).